# Exhibit "3"

# Transcript of the Testimony of
# Monty Merrill

## Date:

December 03, 2020

## Case:

STEPHANIE HERNANDEZ vs CLEARWATER TRANSPORTATION

Page 10

1  of 2019 with Clearwater.
2    Q. And what are you doing for income?
3    A. I sold my house. I'm -- basically had been
4  living off of the proceeds of that, and unemployment.
5    Q. How long have you -- when did you get on
6  unemployment?
7    A. I believe it was February of 2020.
8    Q. Okay. Okay. I want to dig into the time line
9  a little bit here.
10       So Ms. Stephanie Hernandez was employed
11 with Clearwater for at least -- for about three and a
12 half years, correct, 2014 to 2017?
13   A. Correct.
14   Q. Okay. And at some point, she was -- was she in
15 the top ranking of sales agents by commission for the
16 company?
17   A. I believe so, yes.
18   Q. Okay. And by "ranking," we mean she brought in
19 the most money for the company?
20   A. Yeah. And it's based on yield, so she got the
21 highest percentage per day. So I don't -- that doesn't
22 always equate to the most revenue brought in, but
23 it -- it is a determining factor as to what we would
24 consider successful in the sales department.
25   Q. Okay. And you agree she was successful?

Page 11

1    A. For sure.
2    Q. And she was a respected employee at the
3  company?
4    A. Yes.
5    Q. And she exhibited good job performance?
6    A. Yes.
7    Q. Okay. In terms of the economic downturn in
8  2017, looking at Q1 and Q2, there were still
9  reservations happening for cars regularly at the
10 company, right?
11       MS. ABEL: Objection, form.
12   A. Yes.
13   Q. (BY MR. KAPLAN) We talked about this a little
14 earlier. But other than -- specifically, other than
15 the -- the layoff to the sales manager position,
16 what -- what other cuts were made in -- from January to
17 June of 2017, specifically?
18       MS. ABEL: Object to form.
19   A. Remember specifically, but I can tell you we
20 were looking to cut expenses. We went through a -- and
21 -- and again, that's -- the reason I can't tell you
22 specifics during the period is we cut -- we were cutting
23 fleet trying to adjust to doing -- and as we did that,
24 pricing got so cheap that we ended up -- our competitors
25 just kind of backfilled in with additional fleet.

Page 12

1  So then we -- we took another approach
2  of -- we added with -- a lot of additional fleet. So
3  there were -- I can't tell you the exact timing of all
4  that, but that's kind of the gist of what happened.
5        We were -- basically, we were in that
6  mode -- and really, this is a business mode period. But
7  it -- if it isn't working, let's try something else.
8    Q. Okay. So I think we just established actually
9  Matt Rincon was -- was the -- was he the sales manager
10 that -- that most recently proceeded Ms. Hernandez in
11 that role?
12       MS. ABEL: Form.
13   A. I believe that's correct, yes.
14   Q. (BY MR. KAPLAN) Okay. And he got fired?
15   A. Correct.
16   Q. Okay. And I think you testified -- or as
17 corporate representative, you testified he was fired in
18 2017?
19   A. Correct.
20   Q. Okay. And so ultimately, Ms. Hernandez was who
21 you were interested in having replace him?
22       MS. ABEL: Object to form.
23   A. He did more than just sales. He was a -- like
24 a very experienced long-term manager with us. But it
25 just -- as that occurred, it became clear that we

Page 13

1  needed -- we needed some additional help in that -- in
2  that area, that we needed to focus on any avenue we
3  could do to increase revenue.
4    Q. (BY MR. KAPLAN) Okay. Did you reach out
5  to -- to Ms. Hernandez and ask her if she were
6  interested in -- in this promotion?
7    A. I didn't reach out to her, but I saw her in the
8  office. And I believe she mentioned something
9  about -- you know, about the -- about the position. And
10 I said, "Well, why haven't you applied?" So...
11   Q. Okay.
12   A. That didn't really reach -- I didn't go to her
13 specifically to say, "Hey, you want to apply for this?"
14 But I certainly encouraged her to apply for it.
15   Q. Well, that -- that sales manager position was
16 an open position?
17   A. That's correct.
18   Q. And it was post -- the job was posted publicly?
19   A. Correct.
20   Q. And people --
21   A. We generally post internally first before we go
22 outside.
23   Q. Okay. What's the process for posting
24 internally?
25   A. Just putting a posting up to say we have a

Monty Merrill                                                       December 03, 2020
                                                                      Pages 38 to 41

Page 38

1  been the day after. I -- I can tell you I was not
2  aware -- to my knowledge, no one in the company was
3  aware whenever she was let go -- before she was let go,
4  that she was pregnant.
5      Q. It's your testimony today under oath that no
6  one in the company was aware before June 12th that
7  Ms. Hernandez was pregnant?
8          MS. ABEL: Object to form.
9      A. To my knowledge, that is correct.
10     Q. (BY MR. KAPLAN) Okay. And then -- and then
11 Ms. Hernandez disclosed her pregnancy in -- in response
12 to the -- being informed of the layoff?
13         MS. ABEL: Object to form.
14     A. I wasn't in -- whenever she was physically laid
15 off, whenever she was -- the meeting where she was let
16 go, I was not in the that meeting.
17     Q. (BY MR. KAPLAN) Okay.
18     A. So I don't really know the answer to that.
19     Q. Okay. But following that meeting was the first
20 time you were informed that she had been pregnant?
21     A. Yes.
22     Q. And I think you testified it was either Renee
23 or Danny who told you?
24     A. Correct.
25     Q. Okay. And -- and then tell me about this

Page 39

1  accommodation request that came as a result of -- of
2  that meeting that you mentioned earlier.
3      A. No. I'm saying I -- to my knowledge, there'd
4  be no accommodation requests. I -- there -- I -- there
5  is no accommodation request, to my knowledge.
6      Q. Okay. I -- I might have missed it, but I think
7  earlier -- just -- just moments ago, I think you
8  testified that she asked for accommodations in -- in
9  response to being notified that she was going to be laid
10 off?
11     A. Well, in my -- let me clarify my answer.
12         There -- there could -- there could be no
13 accommodations to an employee that's been laid off.
14     Q. Okay.
15     A. So I don't know when -- I don't know -- I don't
16 recall if she told at that -- at that time. I don't
17 recall exactly when she told them. But at that point,
18 even if she had said that in the meeting, she had been
19 terminated and there would be no -- really no official
20 request for an accommodation at that point. Would
21 there?
22     Q. You were aware, weren't you, that before the
23 termination, Mr. Owens talked to Crystal Maldonado at
24 ADP about laying off a pregnant employee, right?
25         MS. ABEL: Object to form.

Page 40

1      A. No. I'm not aware of that.
2      Q. (BY MR. KAPLAN) Okay. And so if Ms. Maldonado
3  were to testify that she was informed by Mr. Owens that
4  Ms. Hernandez was pregnant before the date of
5  separation, that would be not true?
6          MS. ABEL: Object to form.
7      Q. (BY MR. KAPLAN) Or you just don't know?
8      A. That would be something I would not be aware
9  of.
10     Q. Okay. And if Ms. Hernandez were to say that
11 she discussed her pregnancy and her medical conditions
12 and her medical leave on the call with you before
13 termination on the 6th, would that -- that would be
14 untrue?
15         MS. ABEL: Object to form.
16     A. I don't recall any conversation, other than a
17 minor, "Hey, I hadn't been feeling good," kind of thing
18 and "worried about my job." That's all I recall from
19 that conversation.
20     Q. (BY MR. KAPLAN) Okay. As of the date of
21 termination here, Ms. -- you agree that Ms. Hernandez
22 was qualified to perform the essential functions of the
23 sales manager position, right?
24         MS. ABEL: Object to form.
25     A. I do.

Page 41

1      Q. (BY MR. KAPLAN) And with respect to
2  Danny Owens, when's the last time you spoke to him?
3      A. Maybe a couple of months ago, just a -- I text
4  him.
5      Q. I -- I know I asked if you have any data and
6  information, but I am going to ask you for his current
7  cell phone number from a couple months ago that you
8  used --
9      A. Okay.
10     Q. -- because that hasn't been produced in this
11 case.
12         MR. KAPLAN: But, Counsel, we can -- we can
13 come back from a break and get that.
14         MS. ABEL: I've given it to Christie. I
15 sent her his cell phone, but I can resend it.
16         MR. KAPLAN: Okay. You know what we'll do,
17 is we'll just have you confirm that number on the record
18 since I think the numbers that we had were -- or --
19     A. I've got my phone. I can go to my phone and
20 contacts, and you can confirm it with me if you'd like.
21     Q. (BY MR. KAPLAN) Okay. We can -- we can take a
22 break and do it.
23         You don't employ Mr. Owens in any
24 capacity currently, do you?
25     A. I do not.

Page 42

1   Q. And when was the -- when was the last time you
2   did employ him in any capacity through any company you
3   are involved with?
4   A. He was employed through December 31st of 2019.
5   Q. Okay. And do you expect that he'll be joining
6   us for trial?
7       MS. ABEL: Object to form.
8   A. As far as I know, yes.
9   Q. (BY MR. KAPLAN) What about Renee Mitchell,
10  when was the last time you spoke to her?
11  A. It's been quite a -- quite a time since I've
12  talked to Renee, probably a year. But I have her
13  contact information, and I know -- I mean, I know where
14  she's currently employed or at best -- best to my
15  knowledge, where she's currently employed.
16  Q. Where -- where is she -- where is she working
17  now?
18  A. She's working for Roger Beasley. She's the
19  office manager for Roger Beasley Dealerships.
20  Q. You bought these -- the original car rental
21  from Roger Beasley, didn't you?
22  A. I don't -- I bought the Thrifty from corporate,
23  but I did buy the Dollar in Austin from Roger Beasley.
24  Q. Did you set Ms. -- Ms. Mitchell up with that
25  job at Roger Beasley?

Page 43

1   A. I did not.
2   Q. When was the last time she worked for you or
3   any of your affiliated companies?
4   A. I don't have the exact date of that, but it
5   was -- an estimate, probably early 2019.
6   Q. Okay. And do you expect that she'll join us
7   for trial?
8       MS. ABEL: Object to form.
9   A. I expect she will.
10  Q. (BY MR. KAPLAN) Are you familiar with
11  Shelby Summerlin?
12  A. I am.
13  Q. What was her role at the company?
14  A. She was an administrative person that took care
15  of accidents and accident reports, damage, collections,
16  things like that.
17  Q. How long did she work for the company?
18  A. I don't know exactly. I want to say probably
19  five years.
20  Q. Okay. Did she generally do a good job?
21  A. She did.
22  Q. Was she generally an honest employee?
23  A. I would say so.
24  Q. Okay. Do you generally understand her to be an
25  honest person?

Page 44

1   A. I do.
2   Q. She understood the business and people's roles
3   in the business --
4       MS. ABEL: Object to form.
5   Q. (BY MR. KAPLAN) -- in your -- in your
6   experience?
7   A. In my -- in my opinion, yes.
8   Q. And she knew about what roles employees were
9   performing?
10      MS. ABEL: Object to form.
11  A. Yeah, I would say so.
12  Q. (BY MR. KAPLAN) Would -- would -- did she ever
13  work on site at -- in Austin?
14  A. On site. What do you mean?
15  Q. At the counter and kiosk, or around those
16  areas?
17  A. She was around those areas generally looking
18  for damage, vehicles, following up with things like
19  that. But she was never a counter agent or anything
20  like that.
21  Q. Okay.
22  A. Her functions were back at the -- at the
23  service center.
24  Q. Okay. When was the -- the last time you
25  employed her in any way?

Page 45

1   A. I don't have the date exact, but it was
2   probably August of 2019.
3   Q. Okay. Okay. I'll show you -- I'm going to
4   show you Exhibit 19. It's the interrogatories in this
5   case, but I'm going to mark them and put them in the
6   directory before I open them. Sorry.
7       Okay. I'll represent to you that this is
8   the interrogatories prepared and submitted by the
9   company in this case. I want to focus on Number 13 to
10  begin.
11      What evidence or facts, if any, do you have
12  that Ms. Hernandez's claims are barred by her waiving
13  them or doing something where she had unclean hands or
14  did something wrong or consented to waive them or is
15  somehow not allowed to bring them?
16      MS. ABEL: Object to form. I mean, he's
17  not -- he's here in his personal capacity, as opposed to
18  a corporate rep. And legal conclusion.
19  Q. (BY MR. KAPLAN) Okay. And you can go ahead
20  and answer. I just want the facts.
21  A. I don't know what that would be.
22      Are you -- I'm not sure I understand what
23  you're asking.
24  Q. Yeah. Are you aware of any facts that support
25  that Ms. Hernandez waived her claims or consented to

Page 46
1  drop her claims or is barred from bringing her claims
2  for any reason?
3          MS. ABEL: Object to form for the same
4  objections.
5      A. Yeah. I mean, I'm not an attorney. So I -- I
6  can't say that -- I -- I don't know the answer to that.
7      Q. (BY MR. KAPLAN) Okay. Looking at Number 14,
8  what facts or evidence are you aware of that
9  Ms. Hernandez failed to take reasonable steps to
10 mitigate her alleged damages?
11         MS. ABEL: Object to form.
12     A. I don't -- I don't know. I don't have an
13 answer for that.
14     Q. (BY MR. KAPLAN) Regarding Number 15, what
15 facts, if any, do you know of that Ms. Hernandez, her
16 claims are barred by statutes of limitations or failure
17 to exhaust administrative remedy?
18         MS. ABEL: Object to form, since it's
19 calling for a legal conclusion.
20     A. Yeah. I don't know the answer to that.
21     Q. (BY MR. KAPLAN) For Number 16, what facts do
22 you have, if any, that Ms. Hernandez's claims are barred
23 by after-acquired evidence?
24         And by that, I mean what evidence do you
25 have now that you did not have on June 12th of any

Page 47
1  wrongdoing by Ms. Hernandez that would have led the
2  company to fire her if they knew about it?
3          MS. ABEL: Object to form.
4      A. None that I'm aware of.
5      Q. (BY MR. KAPLAN) Turning to Number 18, what
6  evidence of -- of Ms. Hernandez's potential damages were
7  caused by a -- because of the fault of anybody that was
8  in Clearwater?
9          MS. ABEL: Object to form.
10     A. What would -- say that again.
11     Q. (BY MR. KAPLAN) I'll -- sorry.
12         What -- what evidence of any element of
13 Ms. Hernandez's potential damages in this case do you
14 have that they were caused by anyone other than
15 Clearwater?
16         MS. ABEL: Object to form, calls for a
17 legal conclusion.
18     A. Yeah. I don't -- I don't know how to answer
19 that.
20     Q. (BY MR. KAPLAN) Yeah. Okay.
21         What -- what facts -- sorry.
22         What facts do you have that any wages that
23 Ms. Hernandez might have lost -- income she might have
24 lost since she was terminated was caused by the conduct
25 of anyone other than Clearwater?

Page 48
1          MS. ABEL: Object to form.
2      A. I wouldn't know the answer to that.
3      Q. (BY MR. KAPLAN) Okay. Do you have any facts
4  or evidence that -- any lost career opportunities that
5  she might have faced since losing her job at Clearwater
6  was caused by anyone other than Clearwater?
7          MS. ABEL: Object to form.
8      A. I wouldn't know the answer to that.
9      Q. (BY MR. KAPLAN) What about any facts or
10 evidence about any emotional harm that she may have
11 experienced as a result of Clearwater's actions that
12 were -- was caused by anyone -- any entity or person
13 other than Clearwater?
14         MS. ABEL: Object to form.
15     A. I wouldn't know the answer to that.
16     Q. (BY MR. KAPLAN) Okay. Is it the case -- is it
17 the case that at 12:00 p.m. on May 23rd, 2017, a
18 decision was made by you and Danny Owens to eliminate
19 the sales manager position?
20         MS. ABEL: Object to form.
21     A. I don't recall the exact date.
22     Q. (BY MR. KAPLAN) But earlier, you testified
23 that you made the decision and informed Danny of it,
24 correct?
25     A. That's correct.

Page 49
1      Q. And so that -- that means that you didn't make
2  the decision together on -- on a particular date,
3  correct?
4      A. Well, the decision -- the decision was made by
5  me financially. But then I go to Danny, and it's not
6  a -- it's -- wasn't a dictatorial sense. It was more
7  of, "Okay, here's what we have to do. We need to
8  eliminate a head." And obviously, when we do -- when
9  we -- if we do that, we'll bring -- the last person that
10 came in would be the -- would be the first one to go.
11         So it was a conversation. And I would
12 always want to be inclusive of a key manager like Danny.
13 But basically, I made the decision.
14     Q. Okay. You -- you made the decision and went to
15 Danny and -- and informed him about it. And was that on
16 May 23rd, 2017?
17     A. I don't recall the dates.
18     Q. Let's take a look at the calendar.
19         Does the calendar help you recall the
20 date at all, May 23rd?
21     A. No, it doesn't.
22     Q. Was it closer in time to the actual date of
23 termination here, June 12th?
24     A. I don't know the answer to that. Like I said,
25 there was a whole lot of things going on. We had a

Page 78

1  amount of time had gone by, that would have been
2  possible, but not -- not likely.
3      Q. (BY MR. KAPLAN) Okay. Thank you.
4          Okay. So we established here that --
5  that Traye was promoted into the -- the opened airport
6  manager position on June 19th. When was the decision
7  made to transfer him into that position -- or to promote
8  him into that position, rather?
9      A. I don't recall exactly. It may have -- I don't
10 recall exactly.
11     Q. Who made that decision?
12     A. I did.
13     Q. Did anyone else make it with you or just you?
14     A. Danny -- Danny Owens would have been involved
15 in that decision in how we restructured the management,
16 but ultimately, I would have made that decision.
17     Q. When did the company first discuss reopening
18 the airport management position in 2017?
19     A. I don't recall exactly, but probably pretty
20 close to the time it was announced. Things were moving
21 pretty quickly.
22     Q. Did the airport manager position officially
23 post internally as on open position?
24     A. It did not.
25     Q. Why not?

Page 79

1      A. It was more of a reorganization, a
2  restructuring, than it was putting an open position out.
3  Number one, there would have been no one else qualified
4  for the position in the company. And number two, we
5  wouldn't have gone outside the company to fill an
6  additional spot because we did not have an additional
7  spot.
8      Q. So the airport position -- airport manager
9  position was never posted online as an open job,
10 correct?
11     A. That's correct.
12     Q. Okay. And that position was never offered to
13 Ms. Hernandez, either, right?
14     A. That's correct.
15     Q. Okay. And so Zuniga was -- did Zuniga apply
16 for this position or he was just promoted into it?
17     A. He was promoted into it. It was -- it was a
18 reorganization --
19     Q. Okay.
20     A. -- of how we were -- how we restructured our
21 management team at the airport.
22     Q. Okay. And did you consider the pregnant
23 Plaintiff, Stephanie Hernandez, at all for being moved
24 into this position?
25     A. She would have not been qualified for that

Page 80

1  position.
2      Q. Why not?
3      A. Well, she was a new manager, and she was a
4  little rough around the edges. She had huge potential.
5  I think she was going to be great, but she couldn't have
6  managed managers. We were still getting information for
7  her to -- to be able to manage employees and work her
8  through that tactic versus her managing managers.
9          I think eventually she would have -- I -- I
10 could see her -- eventually, she would have absolutely
11 been -- she would have been a great candidate for that,
12 but not at that time.
13     Q. She -- she couldn't manage managers, but Traye
14 could?
15     A. Yes.
16     Q. Okay. And why -- why would Traye have that
17 ability when she didn't?
18     A. Tenure. Traye had been with us for a lot
19 longer. He knew -- and he had a much better
20 understanding how things would work. He had had more
21 time managing people, period. So it was a -- it was a
22 logical next step for Traye to then become manager
23 of -- of managers. Then it -- it was a logical step for
24 him.
25     Q. How much longer had Traye been with the company

Page 81

1  than Stephanie Hernandez?
2      A. In a management position?
3      Q. Oh, I -- I may have misunderstood your
4  testimony.
5          When you say "tenure," do you mean tenure
6  with the company overall, or do you mean tenure in a
7  management position?
8      A. Tenured in a management position.
9      Q. Okay. How long was Traye in a management
10 position?
11     A. I don't know his exact dates, but I want to say
12 three years.
13     Q. Okay. And was he managing managers in that
14 position he had before?
15     A. He did not.
16     Q. Okay. Traye wasn't just a car cleaner
17 beforehand, was he?
18     A. Before when?
19     Q. Before -- before he was a manager and then
20 kiosk?
21     A. I don't recall, but it could have been. Like I
22 said, we do our best to promote from within. So it's
23 quite possible. We've had rental agents, service
24 agents.
25         As a matter of fact, Danny Owens was with

Monty Merrill                                               December 03, 2020
                                                            Pages 118 to 121

Page 118

```
 1                  CHANGES AND SIGNATURE
 2  WITNESS NAME: MONTY MERRILL
 3  DATE: DECEMBER 3, 2020
 4  PAGE LINE       CHANGE              REASON
 5  _____
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____
```

Page 119

```
 1          I, MONTY MERRILL, have read the foregoing
 2  deposition and hereby affix my signature that same is
 3  true and correct, except as noted above.
 4
 5
                    _____
 6                            MONTY MERRILL
 7
 8
 9  THE STATE OF _____)
10  COUNTY OF _____)
11
12          Before me, _____, on
13  this day personally appeared MONTY MERRILL, known to me
14  (or proved to me under oath or through
15  _____) (description of identity
16  card or other document)) to be the person whose name is
17  subscribed to the foregoing instrument and acknowledged
18  to me that they executed the same for the purposes and
19  consideration therein expressed.
20          Given under my hand and seal of office this
21  _____ day of _____, _____.
22
23
                    _____
24                   NOTARY PUBLIC IN AND FOR
                     THE STATE OF _____
25                   COMMISSION EXPIRES: _____
```

Page 120

```
 1         UNITED STATES DISTRICT COURT FOR THE
                WESTERN DISTRICT OF TEXAS
 2                   AUSTIN DIVISION
 3  STEPHANIE HERNANDEZ,       )
                               )
 4        Plaintiff,           )
                               )
 5  VS.                        ) CIVIL ACTION NO.
                               ) 1:18-CV-00319-RP
 6  CLEARWATER TRANSPORTATION, )
    LTD,                       )
 7                             )
         Defendant.            )
 8
 9              REPORTER'S CERTIFICATION
10       REMOTE ORAL AND VIDEO DEPOSITION OF
11                  MONTY MERRILL
12                 DECEMBER 3, 2020
13
14       I, Mercedes Arellano, Certified Shorthand Reporter
15  in and for the State of Texas, hereby certify to the
16  following:
17       That the witness, MONTY MERRILL, was duly sworn by
18  the officer and that the transcript of the oral
19  deposition is a true record of the testimony given by
20  the witness;
21       That the deposition transcript was submitted on
22  _____ to the witness or to the attorney
23  for the witness for examination, signature and return to
24  me by _____;
25       That the amount of time used by each party at the
```

Page 121

```
 1  deposition is as follows:
 2  Mr. Austin Kaplan.....02 HOUR(S):19 MINUTE(S)
 3  Ms. Alise N. Abel.....00 HOUR(S):00 MINUTE(S)
 4       That pursuant to information given to the
 5  deposition officer at the time said testimony was taken,
 6  the following includes counsel for all parties of
 7  record:
 8  FOR THE PLAINTIFF:
 9      Mr. Austin Kaplan
        KAPLAN LAW FIRM, PLLC
10      406 Sterzing Street
        Austin, Texas  78704
11      Phone: (512) 553-9390
        Fax:   (512) 692-2788
12      E-mail: Akaplan@kaplanlawatx.com
13  FOR THE DEFENDANT:
14      Ms. Alise N. Abel
        JACKSON LEWIS P.C.
15      500 N. Akard
        Suite 2500
16      Dallas, Texas  75201
        Phone: (214 728-3250
17      Fax:   (214) 520-2008
        E-mail: Alise.Abel@jacksonlewis.com
18
19       That $_____ is the deposition officer's
20  charges to the Plaintiff for preparing the original
21  deposition transcript and any copies of exhibits;
22       I further certify that I am neither counsel for,
23  related to, nor employed by any of the parties or
24  attorneys in the action in which this proceeding was
25  taken, and further that I am not financially or
```